**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**KAREN FRANCIS**, Individually, and on Behalf Of All Others Similarly Situated,

Plaintiff,

v. Case No. 2:16-cv-01477-PP

**MANPOWERGROUP US INC, AND EXPERIS US, INC.,**

Defendants.

---

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION**

---

This case is an archetypical example of why district courts do not rubber stamp FLSA conditional certification motions. Courts in this district grant these motions only when Plaintiffs offer (1) admissible evidence that (2) all proposed "class" members were (3) victims of the same alleged illegal policy or practice. Plaintiffs' motion meets none of these requirements.

Plaintiffs do not claim that Defendants expressly prohibited Plaintiffs and the putative class from working time they did not record. Rather, Plaintiffs propose a sweeping class comprised of nearly 2500 recruiters in over 160 organizations based on their assertion that Defendants' alleged policies "cajole" all non-exempt hourly recruiters[1] to under-report their work time. According to Plaintiffs, this "cajoling" results in a "de facto ban" on reporting, or receiving pay for, overtime. But the alleged class-wide "policy" that Plaintiffs identify as the agent of this alleged cajoling was a handbook (containing innocuous language) applicable to *only*

[1] As discussed in greater detail below, Plaintiffs also ask the Court to include exempt, salaried recruiters in the putative class based on Plaintiff Francis' *admitted* speculation that other exempt recruiters across the company had "similar experiences" as she.

*the individual work group in which both Plaintiffs were employed*. And, in contrast to the conclusory *assertions* of a de facto class-wide "ban" on overtime (*see* Doc. 22 at 13), the actual *evidence* shows that employees in Manpower's Recruiting Process Outsourcing ("RPO") division[2] routinely worked, reported, and were paid for overtime.

Plaintiffs' burden may be "modest," but it is a burden nonetheless—one that may only be met by production of actual evidence, not Plaintiffs' (often-admitted) speculation that is debunked by the evidence. The Court should deny Plaintiffs' motion.

## I. Relevant Factual Background

### A. RPO's Organizational Structure

Plaintiffs were employed by Defendant Experis US, Inc.'s[3] RPO division. Exhibit 1, Hidalgo-Bernard Declaration at ¶ 3. RPO differs from other divisions within Defendant ManpowerGroup US, Inc. and Defendant Experis US, Inc. because it provides RPO's clients with the opportunity to outsource some or all of their talent acquisition and recruitment processes. *Id.* at ¶ 4. For example, RPO employees often act as representatives of the customers they are supporting. *Id.* Some are even "embedded" on the client's work site and maintain client-issued email accounts. *Id.* In contrast, recruiters for other lines of business within ManpowerGroup US, Inc. or Experis US, Inc.—many of whom work in local "branch" offices under the direct supervision of a branch manager—work to source, identify, screen, and recommend candidates for temporary, short-term contractual placements. *Id.* Sometimes, these short-term, temporary workers are hired by the client after a period of short-term placement.

RPO recruiters are either hourly, non-exempt Associate Recruiters (sometimes referred to

---

[2] As explained in greater detail below, both Plaintiffs worked in the Recruiting Process Outsourcing (RPO) division, a distinct organization within the Manpower family of companies.

[3] Plaintiffs worked in the RPO division of Experis US, Inc. They claim that Manpower Group US Inc. was their joint employer. While Defendants dispute that characterization, they will address the misjoinder at a later time.

as "Recruiter Consultants"), or salaried, exempt Senior Recruiters (which Plaintiff refers to as "Specialists"[4]). *Id.* at ¶ 5. Associate Recruiters and Senior Recruiters both report to Program Delivery Leads who, in turn, typically report to Program Managers. Program Managers typically report directly to Client Delivery Directors, who report to a Client Delivery Vice President. *Id.* at ¶ 6. The RPO organization has three Client Delivery Vice Presidents, and one Vice President of Shared Services. *Id.* Each Client Delivery Vice President has numerous clients within his or her portfolio. *Id.* These can include external, third-party clients, such as Comcast, as well as internal clients such as other ManpowerGroup US, Inc. or Experis US, Inc. lines of business. *Id.*

**B. RPO's Policies Regarding Overtime**

RPO's pay policies, which apply to *all* RPO employees provide that overtime compensation, at one-and-one-half times the employee's regular rate of pay, must be paid to all hourly, non-exempt employees for any time worked in excess of 40 hours per week. *Id.* at ¶ 13. RPO provides training to all management and supervisory employees within RPO which reiterates that all hours worked, including overtime, must be paid regardless of whether an employee obtains a manager's advance authorization to work overtime. *Id.* at ¶ 14. This training also emphasizes that non-exempt employees must record all time worked. *Id.* Finally, the training specifies that any employee complaints about inaccurate pay should be taken seriously, investigated, and that employees should not be retaliated against for raising any such concerns. *Id.* The company also provides employees with a Business Ethics Hotline number, where they can report any suspected violation of the company's Code of Business Conduct and Ethics, which would include any instance in which an employee believes he or she is not being properly compensated. *Id.* at ¶ 15.

---

[4] RPO does not endorse Plaintiff's nomenclature. But, for purposes of this motion, Defendants will refer to exempt recruiters as "Specialists" or Senior Recruiters.

### C. RPO's Unique Client Programs

RPO is comprised of a large number of separate segments of business called "Programs." *Id.* at ¶ 7. Each Program is overseen by a different Program Manager or Director, who is authorized to promulgate work rules, guidelines, or expectations for the recruiters who are assigned to that Program. *Id.* RPO Programs can loosely be classified into three different types: end-to-end recruiting, front-end sourcing, and staff augmentation. Exhibit 2, Friend Declaration at ¶ 5. The type of Program to which an RPO recruiter is assigned also impacts their day-to-day responsibilities, as well as the key performance indicators on which they are measured. *Id.*

In end-to-end recruiting Programs, a client outsources nearly the entirety of their talent acquisition process for one or more segments of their business to RPO recruiters. *Id.* at ¶ 6. In other words, in end-to-end recruiting Programs, RPO recruiters are responsible for the entire recruitment cycle for the client—*i.e.* from the time an open position is announced until a successful candidate is hired for the role. *Id.* In front-end sourcing Programs, the RPO recruiters are only responsible for identifying and screening qualified candidates for the client's open positions. *Id.* at ¶ 7. In a front-end sourcing Program, once the recruiter submits candidates to the client for further consideration, the client takes over the remainder of the interview, offer, and onboarding process, and the recruiter often does not have any further communication with the candidate. *Id.* Sometimes these are short-term Programs, for example, when a client has acute hiring needs or a project for which they need additional support. In other cases, RPO provides ongoing, long-term front-end sourcing support to clients who have high volume hiring needs. *Id.* The third category of RPO Programs is staff augmentation. *Id.* at ¶ 9. In a staff augmentation Program, RPO provides recruiters to augment the client's pre-existing talent acquisition team. *Id.* In these Programs, the RPO recruiter is usually "embedded" with the client (*i.e.* working from the client's location), and the recruiter will typically receive his or her day-to-day instructions

and priorities from one of the client's managers. *Id.* In some instances, a client requests RPO to perform different functions or support different portions of a client's business. *Id.* at ¶ 7. When that occurs, RPO creates multiple Programs supporting that single client. *Id.*

During the last three years, RPO engaged 2476 exempt and non-exempt employees as recruiters who were assigned to approximately 164 distinct Programs for RPO's clients. Exhibit 1, Hidalgo-Bernard Declaration at ¶ 8. The amount of overtime worked in these Programs varies widely. *Id.* at ¶ 11. For example, in a Program for a national consulting firm client, non-exempt recruiters received overtime pay in over 86% of the worked pay periods. *Id.* Similarly, within a Program supporting a national computer manufacturer, non-exempt employees received overtime in nearly 78% of worked pay periods. Moreover, in the RPO-Comcast Northeast Program, employees reported overtime in 31% of pay periods. Overtime work is certainly not isolated to these Programs. During this period, more than 42% of RPO non-exempt employees received overtime pay. *Id.* The number of pay periods in which RPO employees worked and were paid for overtime differs from employee to employee. *Id.* at ¶ 12. However, over 32% of these individuals reported overtime in at least 20% or more of the pay periods in which they worked. *Id.*

Each RPO Program has its own separate management and client expectations, recruitment parameters, and goals. *Id.* at ¶ 8. This is true even when comparing multiple Programs for the same client. *Id.* For example, since October 2013, RPO has operated 24 distinct Programs for RPO's client Comcast alone. *Id.* Plaintiffs Karen Francis and Chey Anne Tatum were both assigned to the RPO Comcast West Sales Program (which Plaintiffs refer to as the "Comcast/Xfinity account"), which was overseen by Client Delivery Director Rachel Boyd. Exhibit 3, Boyd Declaration at ¶¶ 2, 3, 19, 24.

### *1. The RPO Comcast West Sales Program*

The recruiters within the RPO Comcast West Sales Program are responsible for recruiting candidates for door-to-door sales representative and retail store positions with Comcast. Exhibit *Id.* at ¶ 5. These Comcast positions are filled on a hiring "class" basis. *Id.* In other words, RPO recruiters who service this Program are expected to search for, identify, screen and propose to Comcast as many qualified candidates as it will take to fill each hiring "class." *Id.* Consequently, the recruiting needs for this Comcast Program can be considered "high volume" in comparison to other clients' Programs. *Id.* To ensure the team is consistently meeting the client's "high volume" recruiting needs, recruiters on this Program are generally asked to achieve certain weekly goals to ensure they are consistently meeting the client's staffing needs by identifying, screening, and submitting a sufficient number of qualified candidates for each hiring class. *Id.* at ¶ 14. In some markets, recruiters are relieved of these goals if they are too difficult to meet. *Id.*

#### a. <u>RPO Comcast West Sales Program Associate Recruiters</u>

Plaintiff Chey Anne Tatum formerly supported the RPO Comcast West Sales Program as an Associate Recruiter. *Id.* at ¶ 24. Plaintiff Francis similarly supported this Program as an Associate Recruiter until her promotion to a Senior Recruiter position on this Program in November 2014. *Id.* at ¶ 19. Associate Recruiters who support the RPO Comcast West Sales Program are responsible for reviewing applications and resumes submitted by candidates in response to advertisements placed for the open sales representative and retail store positions for Comcast and conducting "active recruiting" by searching for, and identifying, "passive candidates."[5] *Id.* at ¶ 6.

---

[5] Passive candidates are those who have not applied for the open position, but who have posted their resumes online and appear to meet the qualifications for the role. Exhibit 3, Boyd Declaration at ¶ 7. Recruiters can identify passive

These recruiters are also responsible for conducting an initial screening interview by telephone with each candidate. *Id.* at ¶ 8. During this screening interview, the recruiter is expected to confirm information about the candidate's qualifications for the position, to answer any questions the candidates have about the position or the client's culture, to identify any areas of concern or "red flags" regarding the candidate, and to generally assess whether the recruiter believes the candidate would be a good "fit" for the client's expectations. *Id.* Based on the screening interview, the recruiter will either reject the candidate, or submit the candidate for further consideration. *Id.* Once candidates are submitted to the client, recruiters are also responsible for communicating with the candidate about the process, and providing him or her with any required assessments for the position as well as instructions for completing the assessment. *Id.* at ¶ 9. The recruiter is then expected to help prepare the candidate for the potential interview with the client's hiring manager. *Id.*

While candidates are still in consideration for any position with the client, the recruiters are expected to keep in contact with the candidate to ensure the candidate is aware of the status of the process and is maintaining interest in the position. *Id.* at ¶ 10. If a candidate is not selected by the client's hiring manager, the hiring manager provides feedback to the RPO team about the candidate's interview performance and the hiring decision. *Id.* The recruiter is then responsible for informing the candidate that he or she has not been selected for the position, and explaining the feedback from the client regarding the hiring decision. *Id.* The recruiter is expected to communicate this feedback to the unsuccessful candidates in a sufficiently specific, tactful, and

---

candidates for these positions by searching online job boards or using any other appropriate sourcing avenues, for examples, from referrals, from searching LinkedIn or other social media platforms, or from attending job fairs. *Id.* After the recruiter identifies a passive candidate she believes is a good fit for a position the recruiter is trying to fill, he or she will contact the candidate to inform them of the available position, to educate the candidate about the position and the benefits of working for Comcast, and to ultimately assess the candidate's interest in the position. *Id.*

respectful manner. *Id.* But, unlike Plaintiffs, some RPO associate recruiters work in a centralized office environment in which they clock in with a separate system tracking their time and are physically co-located with their supervisors. *See* Exhibit 4, Zietz Declaration at ¶ 8. Employees in this "CORE" group regularly work overtime. *Id.*

Hourly Associate Recruiters who work on the RPO Comcast West Sales Program are expected to record and submit the time they work each day through the PeopleNet timekeeping software interface. *Id.* at ¶ 13.

b. RPO Comcast West Sales Program Senior Recruiters

Plaintiff Karen Francis worked on the RPO Comcast West Sales Program as a Senior Recruiter from November 2014 until her promotion to a Program Delivery Lead position in April 2015. *Id.* at ¶ 19. Senior Recruiters assigned to the RPO Comcast West Sales Program also work to identify, screen, prepare, and recommend qualified candidates for the client's open positions. *Id.* at ¶ 11. However, Senior Recruiters are typically expected to fill higher–level positions for the client, to exercise more discretion with respect to the sourcing strategies they use to identify qualified candidates, and, in contrast to the Associate Recruiters, Senior Recruiters' recommendations and sourcing methods are generally subject to little or no review by the Program Delivery Lead. *Id.* Senior Recruiters also are asked to serve as mentors or training resources for new recruiters, and may be assigned responsibility for preparing training materials and ensuring all recruiters are trained on specific topics. *Id.*

Although Plaintiff Francis worked remotely from her home as a Senior Recruiter, there are some Senior Recruiters on the RPO Comcast West Sales Program who are assigned to work at the client's place of business. *Id.* at ¶ 12. These Senior Recruiters also have the responsibility to assist the Program in maintaining a good client relationship. *Id.* They do this through their ongoing and significant communication with Comcast West Sales Hiring Managers regarding the

client's expectations and feedback regarding candidates placed with the client. *Id.* Finally, Senior Recruiters are frequently assigned additional analysis and reporting responsibilities regarding the team's metrics, prioritization of workload, and sourcing strategies—including identifying and recommending new and innovative opportunities or methods for sourcing candidates. *Id.* at ¶ 13. Not surprisingly, these varied job duties result in varied salaries among Senior Recruiters. As a high-volume recruiter working from home, Plaintiff Francis earned an annual salary of over $50,000. Exhibit 1, Hidalgo-Bernard Declaration at ¶ 16. However, other recruiters, who performed different tasks, earned considerably more. For example, a Senior Recruiter supporting a semiconductor manufacturing client earns an annual salary in excess of $97,000. Exhibit 5, Lagos Declaration at ¶ 7. Similarly, another Senior Recruiter who supported a healthcare client earned in excess of $92,000 (Exhibit 1, Hidalgo-Bernard Declaration at ¶ 16) and a Senior Recruiter supporting an energy client earns nearly $100,000 on an annual basis (Exhibit 2, Friend Declaration at ¶ 11).

c. <u>The Boyd Team Handbook</u>

The Comcast West Sales Program is structured so that RPO can fulfill its contractual obligations to the client with employees working no more than 40 hours a week; consequently, hourly recruiters who work on the RPO Comcast West Sales Program are neither expected nor required to work more than 40 hours per week. *Id.* at ¶ 16. Rachel Boyd created a "Handbook" for this RPO Comcast West Sales Program team that memorializes the expectation that recruiters on her team were not expected to, and were actually prohibited from, working more than 40 hours per week. *Id; see also* Boyd Team Handbook, attached as Exhibit A to Exhibit 1. This Handbook was only distributed to recruiters who supported Ms. Boyd's program, not to recruiters who supported any of the other RPO Programs since October 2013. *See id.; see also* Hidalgo-Bernard Declaration at ¶ 9.

### 2. *The Recruiters' Experience on the RPO Comcast West Sales Program Differ from Recruiters' Experiences on other RPO Programs*

The RPO Comcast West Sales Program is not representative of the expectations for other RPO Programs, or even for other RPO Programs for Comcast. *Id.* As an example, a comparison of RPO Comcast West Sales Program to the Comcast Corp. HQ Program reveals numerous distinctions that directly impact the job responsibilities of, and expectations for, recruiters—including the types of positions the RPO recruiters are asked to fill, the structure and volume of the recruiters' workload, the key performance indicators on which the recruiters are measured, and even whether the recruiters work remotely from their homes or whether they are assigned to physically work at the client's place of business. *Compare, generally,* Exhibit 3 Boyd Declaration *to* Exhibit 6, Kain Declaration. More specifically, on the Comcast Corp. HQ Program, Senior Recruiters are expected to recruit candidates for high-level professional positions at Comcast. *See* Exhibit 6, Kain Declaration at ¶ 8. Additionally, hourly Associate Recruiters may need to work more than 40 hours per week to complete their work; therefore, they can, and do, work overtime. *Id.* at ¶ 9. Recruiters who support the Comcast Corp. HQ Program are not involved in "high volume" or "class" recruiting, and are *not* expected to meet daily or weekly goals regarding the number of candidates submitted for open positions. *Id.* at ¶ 8.

Recruiters who support other clients and Programs have even more divergent experiences and expectations from those described by the Plaintiffs. For example, a Senior Recruiter who supports an RPO semiconductor manufacturing client has job responsibilities and expectations that differ dramatically from those described by Plaintiff Francis on RPO Comcast West Sales Program. Exhibit 5, Lagos Declaration at ¶ 5. This Senior Recruiter has an important role in maintaining RPO's relationship with the client because of his ongoing and significant contact with the client's hiring managers. *Id.* Rather than primarily sourcing candidates for the client's

open positions through online database searches, he frequently travels to, and represents the client at, job fairs throughout his region. *Id.* He is also expected to create and implement the candidate sourcing strategy for the client. *Id.* Additionally, the client relies on this Senior Recruiter to set up and run its orientation for newly-hired employees. *Id.* at ¶ 6. This Senior Recruiter consistently consults with the client's hiring managers about compensation or qualifications for positions, and he uses his discretion and judgement in advising the client when they need to adjust their expectations for positions or candidates. *Id.*

By way of further example, other Senior Recruiters who supported a healthcare client were expected to consistently exercise their discretion and independent judgment in evaluating candidates for nursing and other professional positions within the client's Intensive Care Unit. Exhibit 7, Sprague Declaration at ¶ 5. Specifically, these recruiters had to evaluate candidates for positions based on their qualifications and their personalities—*i.e.* their bedside manner—rather than using any sort of "script" or template from the client. *Id.* These recruiters were also expected to use their industry-specific knowledge to analyze and assess whether any concerns about the candidates' backgrounds might preclude them from obtaining or maintaining all necessary licensure for the positions they sought. *Id.*

## II. Legal Standards

Plaintiffs repeatedly describe their burden in seeking conditional certification of a massive class as "minimal." But while courts in this district acknowledge that a plaintiff's burden is "modest," they stress that this burden is not a "mere formality." *Krupp v. Impact Acquisitions LLC*, 2016 WL 7190562 at *5 (E.D. Wisc. 2016). "This is because a plaintiff's discovery demands upon conditional certification may impose a tremendous financial burden to the employer and courts must be careful to guard against wasting the parties' time and resources where certification is not appropriate at the outset." *Id.* at *5 (internal quotations omitted). *See*

*also Adair v. Wisconsin Bell,* 2008 WL 4224360 at *4 (E.D. Wisc. 2008). While the *quantity* of proof Plaintiffs need offer at this stage may be modest, the *quality* of the proof they must offer is not diluted at the conditional certification stage. Courts in this district require Plaintiffs to produce *admissible* evidence to support their requests for conditional certification. *Adair,* 2008 WL 4224360 at *8. If, as is the case here, plaintiffs premise their request for conditional certification on an alleged company-wide policy, they must offer *admissible* evidence that "they and the putative class were subject to [that] common unlawful practice," not rely on "vague assertions that they 'understood' [such a policy to exist]." *Id.* Nor are courts limited to considering only the proof offered by the Plaintiffs. "Rather, the court evaluates the record before it, including the defendants['] oppositional affidavits, to determine whether the plaintiffs are similarly situated to other putative class members." *Krupp,* 2016 WL 7190562 at *5. The "critical inquiry in determining whether a court should exercise its discretion to authorize [conditional certification] is whether the representative plaintiff has shown that she is similarly situated to potential class plaintiffs." *Adair,* 2008 WL 4224360 at *2 (citations omitted). Where, as here, Plaintiffs offer (speculative) evidence only of their personal experiences in one of many Programs (the Comcast West Sales Program) conditional certification must be denied. *Martinez v. Regency Janitorial Servs., Inc.,* 2012 WL 252230 at *4 (E.D. Wis. 2012). *See also Miller v. ThedaCare, Inc.,* 2016 WL 4532124 at *7 (E.D. Wisc. 2016)("[C]onditional certification is inappropriate where the plaintiff [can] not show that the same policies and procedures were followed at offices or branches of a company.") (quoting *Blaney v. Charlotte-Mecklenburg Hosp. Auth.*, 2011 WL 4351631 at *10 (W.D. N.C. 2011)). Under these standards, the record in this case conclusively establishes that Plaintiffs have *not* shown that they are similarly situated to their fellow Comcast West Sales workers, let alone the massive class they seek to certify.

## III. Argument

### A. The Court Should Deny Plaintiffs' Request to Send Notice to All "Associate Recruiters" in the RPO Division.

Plaintiffs' argument that they are entitled to send notice to all "associate recruiters" across the RPO division may be summarized as follows: (1) they received an employee handbook that (allegedly) "prohibits" recording overtime; (2) they were given performance targets that they believed they could not hit in a 40 hour week; (3) this "cajoled" them into working time in excess of 40 hours that they did not record; and (4) they "believe" that at least some other teams of workers in RPO had similar targets and were similarly cajoled into working unrecorded overtime, resulting in (5) a "de facto" ban on overtime. But, as Plaintiffs implicitly admit, they have no actual evidence that employees outside their discrete work group were prohibited from recording overtime or that they worked overtime that was not recorded.

#### *1. The "handbook" Plaintiffs vilify does not apply to employees outside of Plaintiffs' small work group and is wholly innocuous.*

Plaintiffs place great weight on the notion that "Manpower" had an "official, written policy of prohibiting overtime work." Doc. 22 at 13. But they identify this "official policy" as a handbook provided to them, and authored, by their supervisor, Rachel Boyd. *See* Doc. 21, Tatum Declaration , at ¶ 20 ("According to the handbook, I was not allowed to record overtime without prior approval.")[6] While Plaintiffs imply in their motion that this policy applied across the RPO organization, they never actually assert this in their declarations. To the contrary, Plaintiff Tatum implicitly acknowledges that other Programs have different practices when she

---

[6] The document does not prohibit *recording* overtime, it prohibits *working* it without prior authorization. It states in relevant part "Assignments are for 40 hours/week, unless otherwise directed by your lead or manager. Overtime hours are *worked* only with prior approval from your lead or manager." *See* Boyd Team Handbook, attached as exhibit (emphasis supplied). This is consistent with Ms. Boyd's testimony that employees were not expected to, and were actually prohibited from, working more than 40 hours a week for this client. Notably, even Plaintiffs do not claim that there is anything improper, let alone illegal, about prohibiting employees from *working* more than 40 hours a week.

avers that overtime was not to be worked "on *this* account," that is, the account (or Program) to which she was assigned. *Id.* at ¶ 21. Her claims that other employees likewise failed to record overtime hours are limited to employees in her *own* Program. *Id.* at ¶ 22 (referencing co-workers in the "Comcast/Xfinity" Program). Instead, the *sole* support for the notion that there was an RPO-wide "ban" on recording overtime comes from Plaintiff Francis, who claims that, in addition to the Comcast/Xfinity Program, RPO "has a set quota for at least some of its other accounts" (Doc. 20 at 5, para. 44); she "knew" (she does not say how she knew) that employees in other Programs "had difficulty meeting their quotas within the time given them" (*id.* at 6, para. 45); and asserts that RPO's "standard practice" was to assign its Associate recruiters more work than they could perform in 40 hours "while strictly enforcing its official, written policy of prohibiting overtime work." *Id.* These claims are premised on and permeated by speculation; they do not meet Plaintiffs' burden of adducing admissible evidence showing that all RPO associate recruiters were subject to an illegal policy to deny them overtime.

First, while Plaintiffs offer a description of the handbook, they do not attach a copy (despite having produced a copy of the handbook in response to discovery requests). However, Defendants have provided a copy of this document, attached as Exhibit. It does not say what Plaintiffs suggest it says. Rather than prohibiting the *recording* of overtime, it prohibits *working* overtime without advance authorization. *Id.* But directing employees not to *work* overtime without prior authorization is not illegal.

At maximum, Plaintiffs have asserted the existence of a practice—the alleged prohibition of recording overtime—promulgated by one supervisor and applicable only to the Program she oversaw. Courts in this district repeatedly have refused to certify a company-wide class when, as here, the Plaintiffs' evidence is focused on one supervisor, or even a small group of supervisors.

*See Hadley v. Journal Broadcast Group, Inc.*, 2012 WL 523752 (E.D. Wisc. 2012) (claims that one supervisor "shaved time" do not warrant company-wide certification); *Martinez*, 2012 WL 252230 at *4 (rejecting plaintiffs' assertion that "supervisors" at a single work site causing impermissible deductions from time worked "at most, reflects a practice of a single worksite. Alleged violations that are isolated to . . . specific supervisors are generally insufficient for company-wide collective action." *Adair*, 2008 WL 4224360 at *7 ("Alleged FLSA violations stemming from the enforcement decisions of individual supervisors, rather than a company-wide policy or plan are not appropriate for collective treatment.") Plaintiffs' argument, which is based on their (inaccurate) description of the Boyd Team Handbook, simply underscores how *in*appropriate this case is for collective treatment. The Court should deny Plaintiffs' motion.

Nor does Plaintiffs' speculation and hearsay regarding other employees, *all of whom reside within the Plaintiffs' own Program*, provide sufficient basis to grant a motion seeking RPO-wide conditional certification. Plaintiff Tatum states:

- "I heard other Associate Recruiters on *group* calls also talk about the time needed to do the job and having to work more than forty hours in a week." Doc. 21 at p. 4, para. 32 (emphasis supplied).
- "While we did not discuss our pay . . . I *assume* that my colleagues were also not being paid for their overtime hours." *Id.* at para. 33 (emphasis supplied).

Plaintiff Francis states:

- "While an Associate Recruiter I communicated with fellow *Comcast* team members regularly through Google Chat and other online methods." Doc. 20, p. 5 at para. 41 (emphasis supplied).

- "When I became a Recruiting Specialist, the other Associate Recruiters would come to me to complain about having to work more than forty hours in a week." *Id.* at para. 42.

Neither declaration purports to evince a practice of unpaid work outside of Plaintiffs' "Comcast/Xfinity" Program. Even within their own Program, Plaintiffs' hearsay statements and general observations about co-workers are insufficient to support a claim for conditional certification. *Adair*, 2008 WL 4224360 at *8-10 (hearsay statements, references to observations of fellow workers' alleged off the clock work and assertions that plaintiffs' "understood" others to have been underpaid do not meet burden of providing factual support for conditional certification). *See also Will v Panjwani*, No. 1:13-cv-1055-JMSMJD, 2013 U.S. Dist. LEXIS 141453, at *13-14, n. 5 (S.D. Ind. Oct. 1, 2013)(stating that the court "has not considered Plaintiffs' generic assertion about conversations with unidentified coworkers").

Plaintiffs' (inaccurate) description of a handbook policy upon which they hinge their motion for conditional certification applied only to Plaintiffs' own discrete Program and their hearsay statements and generic observations about other employees within their Program would not support conditional certification of a collective action comprised of their own co-workers, let alone the sprawling, RPO-wide class that they seek. The Court should deny the motion.

*2. Plaintiffs' testimony about their own production targets do not support RPO-wide conditional certification.*

Next, Plaintiffs assert that the Court should certify an RPO-wide collective action because employees in their Program were given weekly production targets, or "quotas," that (in their opinion) could not be accomplished within 40 hours of work. They characterize this as "[a] common fact pattern that creates a modest factual showing that collective action is appropriate. . . ." Doc. 22 at 18. Not so.

First, Plaintiffs acknowledge that they cannot attest to whether, or to what extent, other Programs within RPO even *have* "quotas," let alone whether those quotas are subjectively perceived as too high to be achieved in 40 hours of work or "cajole" others to work time they do not record.[7] Plaintiff Tatum says nothing at all about quotas in other Programs, and Plaintiff Francis says only that she believes there is "a set quota for at least some of [RPO's] other accounts." Doc 20, p. 5 at ¶ 44. In other words, Francis acknowledges that she does not *know*, and hence cannot offer admissible evidence regarding, whether quotas that supposedly "cajole" employees to work time they do not report even exist in other groups, let alone whether they are, in the subjective opinion of other employees, too high. And she does not even try to suggest that employees outside her program actually *worked* hours that they did not record. This admitted speculation alone dooms Plaintiffs' argument.

Plaintiffs' jeopardy increases when the Court considers the actual evidence regarding other Programs. This evidence shows that quotas are far from universal. Both Plaintiffs Francis and Tatum worked in a "high volume" Program that established production targets. *See* Exhibit 3, Boyd Declaration at ¶ 5. However, Programs throughout RPO were structured very differently and had no such targets. For example, recruiters who support the RPO Comcast Corp. HQ Program do not have any daily or weekly goals regarding the number of candidates they must submit to the client. *See* Exhibit 6, Kain Declaration at ¶ 8. Similarly, Recruiters who support Programs that are devoted to filling specialized, or high-level professional, technical, engineering, financial positions for RPO's clients do not have daily or weekly goals regarding candidate submissions. *See e.g.* Exhibit 5, Lagos Declaration at ¶ 7.

---

[7] As detailed below, a number of Programs have no such quotas.

Finally, even if Plaintiffs *had* produced actual evidence of an RPO-wide quota system (they have not and could not) and Defendants had not produced evidence of large segments of RPO without a quota (they have done so), there would be no *legal* support for Plaintiffs' theory that production quotas always (or even usually) warrant conditional certification. Plaintiffs assert that courts "common[ly]" certify collective actions when the employer maintains a production standard or quota and a plaintiff claims that she cannot achieve that quota in the time allotted. But the only decision from this District Plaintiffs cite for this proposition—this Court's recent order in *Krupp*—says nothing of the sort. In *Krupp,* the plaintiffs produced evidence that *all* putative class members, not simply the employees in their workgroup, were scheduled for 45 hours of work a week. They were paid based on this schedule without any mechanism to report additional working time. 2016 WL 7190562 at *2-3. While the defendant company maintained a benchmark of 40 service calls a day, the gravamen of the plaintiffs' complaint, and this Court's certification order, was that employees were obligated to complete online training classes *outside* of the scheduled, paid work day. *Id.* at *6. *Krupp* does not stand for the proposition that a "quota system," coupled with a representation by one or two employees (who undisputedly recorded their own work hours) that they could not achieve their quota within a forty hour week, usually, or even often, results in conditional certification.

This case is much more akin to *Adair* than to *Krupp.* In *Adair,* call center employees testified that they regularly arrived at work early, and stayed late, because they believed that they could not perform all the tasks necessary to receive customer calls within their scheduled shifts. Rejecting the plaintiffs' claims that this warranted company-wide certification, the court in *Adair* noted that there is a significant difference between a system that, "by its very nature, failed to capture its employees entire time at work" (like that alleged in Krupp) and the allegation by

employees that they *believed* they should arrive early and stay late. *Adair,* 2008 WL 4224360 *5. "The first reflects a company-wide policy that would merit a collective response. The second reflects what may be no more than a misunderstanding on the part of a few employees. Unless far more widespread than the plaintiffs, it would not merit the kind of collective action plaintiffs seek to bring." *Id.* In this case, unlike in *Krupp,* it is undisputed that company policy requires employees to complete their own time card reporting hours worked each week. It also cannot be plausibly disputed that the Rachel Boyd Handbook (which applies to a small fraction of the putative class) does not prohibit employees from doing so. While Plaintiffs Tatum and Francis may have offered admissible evidence that *they* felt obligated to work hours they did not record, this is no evidence of a system that "by its very nature" required employees to work more hours than they report. The Court should deny this motion.

*3. The evidence belies assertions of a "de facto ban" on overtime.*

This is particularly true when the only evidence before the court belies Plaintiffs' conclusory claim that RPO maintains a division-wide "de facto ban" on reporting overtime hours. *See* Doc. 22 at 21. *See also* Doc. 20 at ¶ 46, Francis Declaration (alleging RPO "strictly enforce[es] its official, written policy of prohibiting overtime work.") That is precisely the case here. Recruiting positions are structured differently from Program to Program. Some employees work within Programs in which the job is structured so that overtime is contemplated; others do not. *See* Exhibits 6 and 7, Kain Declaration at ¶ 9, Lagos Declaration at ¶ 8. Neither Plaintiff offers admissible evidence to the contrary. Not surprisingly, then, the amount of overtime worked by employees varies from Program to Program. Exhibit 1, Hidalgo-Bernard Declaration at ¶ 12. But Defendants' payroll records reveal that overtime is far from uncommon: 42% of non-exempt RPO recruiters have reported, and been paid for, overtime in the last three years. And nearly a third of these employees reported overtime in 20% or more of the pay periods they

worked during this time. Further, while Plaintiffs worked on a team supporting the Comcast/Xfinity product, RPO maintained over 20 other Comcast Programs. Employees in most of these workgroups reported overtime. In fact, non-exempt employees in the "RPO – Comcast Northeast" Program reported overtime in nearly 1/3 of the non-exempt pay periods worked.[8] Exhibit 1, Hidalgo-Bernard Declaration at ¶ 11. Far from showing a "de facto ban" on, or "strict enforcement" of a supposed policy prohibiting overtime, the actual evidence illustrates the opposite—employees throughout RPO regularly work, report and are paid for overtime.[9]

Plaintiffs' failure to produce admissible evidence supporting their conclusory assertions that *all* RPO recruiters (a) were given quotas, (b) that could not be achieved within a 40 hours week, and (c) were prohibited from recording overtime, independently dooms their motion. But, even if it did not, the uncontested evidence, which shows that there was no RPO-wide policy prohibiting overtime, would compel the Court to reject Plaintiffs' request for conditional certification. The Court should deny Plaintiffs' motion.

### B. The Court Should Deny Plaintiffs' Request to Send Notice to a Putative Class of Exempt "Recruiting Specialists."

Plaintiffs also request that the Court authorize notice to a vast group of salaried, exempt "Recruiting Specialists." This request is based solely on a handful of sparse contentions in Plaintiff Francis' declaration, including her assertion that, despite Francis' admission that she does not actually *know* any other Specialists, let alone what their job duties are, it is a "logical conclusion" that all exempt recruiters across RPO were misclassified as exempt under the FLSA.

---

[9] Moreover, the varied circumstances of Associate Recruiters' jobs further demonstrates why Plaintiffs are not similarly situated to those they seek to represent. Plaintiffs Francis and Tatum both worked alone out of their homes and reported their work time on a weekly basis using Defendants' PeopleNet system. Because they worked at home, they were not supervised directly and in person. In contrast, Associate Recruiters in some other Programs work in a physical, centralized call-center environment, together with their supervisors, in which they clocked in upon their arrival at work and clocked out at the conclusion of the day. Exhibit 4, Zietz Declaration at ¶ 7.

Of course, courts may not grant conditional certification based on *conclusions* (however logical, or illogical, they may be); *evidence* is required. Plaintiffs offer none here.[10]

In her declaration, Francis states that, as a Recruiting Specialist, she was classified as exempt from the overtime requirements of the FLSA (para. 8), that her duties were "essentially the same" as those of an Associate Recruiter (para. 9), and she regularly worked more than 40 hours a week without receiving overtime (para 10). Doc. 20 at 2. But her sole "evidence" that other exempt recruiters across RPO were also (allegedly) misclassified is found in paragraph 56 of her declaration:

> While I did not know other individuals in the "specialist" position, Steven Franks had told me this position was a natural stepping stone to management, so I believe that other Recruiting Specialists will have had similar experiences to me.

Doc. 20 at 7. In her motion, Plaintiff argues that it is a "logical conclusion" that, because she *believes* other exempt recruiters performed her same duties, the Court should grant conditional certification of a class comprised of all such recruiters across RPO. But neither conclusory allegations in a declaration nor unsupported allegations of widespread violations are sufficient to support conditional certification. *Adair,* 2008 WL 4224360 at *6.

This is especially true where, as here, Plaintiffs claim that a broad swath of employees across a large corporate division are misclassified as exempt. But, as a matter of law, merely sharing the same classification with putative class members is not enough. Instead Plaintiffs must make a factual showing

> that the individuals they seek to represent are similarly situated *with respect to factors relevant to the exemption analysis.* An employee qualifies for the FLSA's administrative exemption if the employee's primary duty is (1) "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" and (2)

[10] Defendants do not concede that Ms. Francis was misclassified, but this dispute is not relevant to the conditional certification motion.

> "includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). Thus, plaintiffs must demonstrate that potential class members in the positions [at issue in the putative class] shared sufficiently similar duties and levels of discretion and independent judgment so as to make it possible to determine collectively whether defendant classified them improperly.

*Ruiz v. Serco, Inc.,* 2011 WL 7138732 at *5 (W.D. Wisc. 2011)(emphasis supplied). *See also Gromek v. Big Lots, Inc.,* 2010 WL 5313792 at *3 (N.D. Ill. 2010) (uniform classification, job description, and title insufficient to support conditional certification when job duties differ.).

Plaintiff Francis states in her declaration that her job as an Associate Recruiter was to "use a pre-determined script" when speaking with candidates and "match" those candidates to selection criteria. Doc. 20 at p. 2. She asserts that she had "essentially"[11] the same duties when she was promoted to a Recruiter Specialist position. Presumably, she asserts that this is insufficient judgment and discretion to support her classification as exempt. But she acknowledges that she does not even know any other Recruiting Specialists, let alone what their duties may be. Instead, she tells the Court that it is "logical" to conclude that other exempt recruiters in RPO had the same, allegedly non-exempt, duties. But courts require evidence, not conclusions, to support such claims. *Adair,* 2008 WL 4224360 at *6.

While Plaintiffs offer no such evidence, Defendants have. The evidence shows that some Senior Recruiters in her *own Program* are, unlike Plaintiff, staffed at client locations and have significant, in-person client relationship management obligations. *See* Exhibit 3, Boyd Declaration at ¶ 12. These duties, which must be evaluated to determine these employees' exemption status, are wholly unlike those described by Plaintiff. Additionally, Senior Recruiters in other segments of RPO have duties substantially different than those described by Plaintiff in her declaration (*i.e.* "reading from a script" and matching candidates by pre-determined criteria).

---

[11] If her duties were "essentially" the same, then they were not *entirely* the same, but Plaintiff nowhere explains this difference.

For example, a Senior Recruiter who supports a semiconductor manufacturing client is assigned to work at the client's site, is expected to create and implement the candidate sourcing strategy for the client, and has an important role in maintaining RPO's relationship with the client because of his ongoing and significant contact with the client's hiring managers. Exhibit 5, Lagos Declaration at ¶ 5. This recruiter also frequently travels to, and represents the client at, job fairs throughout his region, and the client relies on this Senior Recruiter to set up and run its orientation for newly-hired employees. *Id.* at ¶ 6. This Senior Recruiter consistently consults with the client's hiring managers about compensation or qualifications for positions, and he uses his discretion and judgement in advising the client when it needs to adjust its expectations for positions or candidates. *Id.*

Additionally, Senior Recruiters who support the Comcast Corp. HQ Program may be tasked with recruiting for high-level professional positions for the client, and serve as important consultants to the client's hiring managers. Exhibit 2, Kain Declaration at ¶¶ 5, 8. More specifically, these Senior Recruiters typically work with the client to help define the role they are seeking to fill, to identify desired qualifications from candidates for that role, and even to advise the client on a recommended compensation range for the position. *Id.* In other words, the client relies on Senior Recruiters on these Programs for their recruiting experience and labor market expertise. *Id.* Not surprisingly, these varied duties result in varied compensation. While Plaintiff Francis was certainly not poorly paid—she made over $63,000 a year—other Senior Recruiters with different tasks were compensated at a meaningfully higher rate: between $92,000 and $100,000 a year. Exhibit 5, Lagos Declaration at ¶ 7; Exhibit 1, Hidalgo-Bernard Declaration at ¶ 16; and Exhibit 2, Friend Declaration at ¶ 11.[12]

---

[12] The Supreme Court has recently stated that employees who earn an average of $70,000 a year are "hardly the kind of employees that the FLSA was intended to protect." *Christopher v. SmithKline Beecham Corp,* 132 S. Ct.

Plaintiffs' perfunctory request that the Court certify a class of exempt Recruiter Specialists across RPO is based exclusively upon Plaintiff Francis' conclusory assertions that *she* was improperly classified as exempt and she *believes* that other Recruiter Specialists, whom she admits she does not know, were similarly misclassified. The Court need not even consider Defendants' evidence in response to reject this request. But doing so shows conclusively that Recruiter Specialists' duties and job circumstances vary widely across RPO, and even within Francis' own Program. The Court should deny Plaintiffs' motion.

## IV. Conclusion

The "critical inquiry" in assessing a plaintiff's motion for conditional certification "is whether [plaintiffs] have shown that [they are] similarly situated to the potential class plaintiffs." *Adair,* 2008 WL 4224360 at *2. Plaintiffs have the obligation to produce admissible evidence to support this burden, *id.* at *8, and they have failed to do so here. The alleged policy that they claim ties them and the putative class together is their interpretation of an employment that contains a perfectly appropriate direction to employees to obtain advance authorization for overtime and which applied to their Program only. They have offered only speculation that employees in other Programs were given a quota, let alone one that "cajoled" employees in other Programs to work hours they did not report. And they claim, *without any support at all,* that Defendants maintained a "de facto ban" on overtime. But while Plaintiffs speculate, Defendants have produced actual, and uncontested, evidence. It shows that the quotas about which Plaintiff complains were not universal and that employees throughout RPO record, and are paid for, overtime work. In fact, in some Programs, overtime is the rule, not the exception. Plaintiffs'

2156, 2173 (2012). Here, it strains credulity to suggest that RPO was compensating employees at this rate to perform rote, routine, fungible work. Of course, the Court need not address this merits question at this juncture, not least because Plaintiff Francis has wholly failed to offer admissible evidence that she performed the same duties as *any* other Specialist or Senior Recruiter, let alone those throughout RPO.

unvarnished speculation, coupled with admissible evidence that their speculation is simply wrong, dooms their motion.

The weaknesses of Plaintiffs' request is all the more glaring when they ask the Court to conditionally certify not just an RPO-wide group of Associate Recruiters, but also an RPO-wide group of salaried, exempt, Senior Recruiters. Here, they barely try to carry their burden, admitting that while Plaintiff Francis does not know other Senior Recruiters, she *believes* that they performed the same, allegedly non-exempt, job duties. This admission alone dooms Plaintiffs motion, but evidence showing that the duties of, and compensation paid to, Senior Recruiters vary widely from Program to Program eliminates any doubt. The Court should deny Plaintiffs' motion.

DATED: March 24, 2017

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**


/s/ Keith E. Kopplin
Keith E. Kopplin
WI State Bar No. 1044861
Pabst Boiler House
1243 North 10th Street, Suite 200
Milwaukee, WI 53205
Telephone: 414.239.6406
Facsimile: 414.755.8289
keith.kopplin@ogletree.com

*Attorneys for Defendants ManpowerGroup Us Inc. and Experis US, Inc.*


29209373.1