**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**KAREN FRANCIS**, Individually, and on Behalf Of All Others Similarly Situated,

Plaintiff,

v.

Case No. 2:16-cv-01477-PP

**MANPOWERGROUP US INC, AND EXPERIS US, INC.,**

Defendants.

---

**DECLARATION OF GEOMHARA HIDALGO-BERNARD**

I, GEOMHARA HIDALGO-BERNARD, hereby declare and state as follows:

1. I am over 18 years of age and competent to testify to the matters stated in this Declaration. I have personal knowledge of the facts attested to in this Declaration.

2. I am currently employed by Defendant Experis US, Inc. as a People and Culture Consultant, which is essentially a Human Resources Consultant role. In this role, I have been supporting the Recruiting Process Outsourcing ("RPO") organization for approximately five years. I have personal knowledge regarding RPO's organizational structure, clients, recruiting job titles and general job responsibilities, training regarding wage and hour issues provided to management and supervisory employees, and pay and timekeeping policies and practices.

3. Plaintiff Karen Francis and Plaintiff Chey Anne Tatum were employed in the RPO organization.

4. RPO differs from other lines of business within Defendant ManpowerGroup US, Inc. and Defendant Experis US, Inc. because it provides RPO's clients with the opportunity to



**EXHIBIT 1**

outsource some or all of their talent acquisition and recruitment processes. RPO employees often act as representatives of the customers they are supporting. Some even are "embedded" on the client's work site and maintain client-issued email accounts. In contrast, recruiters for other lines of business within ManpowerGroup US, Inc. or Experis US, Inc., many of whom work in local "branch" offices under the direct supervision of a branch manager, work to source, identify, screen, and recommend candidates for temporary, short-term contractual placements. Sometimes, those short-term, temporary workers are hired by the client after a period of short-term placement.

5. Within RPO, recruiters fall into two FLSA exemption categories: hourly, non-exempt Associate Recruiters (sometimes referred to as "Recruiter Consultants"), and salaried, exempt Recruiters (which I understand that Plaintiff Francis refers to as "Specialists").

6. Associate Recruiters and Senior Recruiters both report to Program Delivery Leads who, in turn, typically report to Program Managers. Program Managers typically report directly to Client Delivery Directors, who report to a Client Delivery Vice President. The RPO organization has three Client Delivery Vice Presidents, and one Vice President of Shared Services. Each Client Delivery Vice President has numerous clients within his or her portfolio. These can include external, third-party clients as well as internal clients, such as other ManpowerGroup US, Inc. or Experis US, Inc. lines of business.

7. RPO is comprised of a large number of separate segments of business called "Programs." Each Program is overseen by a different Program Manager or Director, who is authorized to promulgate, or delegate the creation of, work rules, guidelines, or expectations for the recruiters who are assigned to that Program.

8. Since October 2013, RPO has placed employees on approximately 164 individual

Programs, including multiple Programs for the same clients. Each Program has its own separate management and client expectations, recruitment parameters, and goals. This is true even when comparing multiple Programs for the same client. For example, since October 2013, RPO has operated 24 distinct Programs for RPO's client Comcast alone.

9. Plaintiffs Karen Francis and Chey Anne Tatum were both assigned to the RPO Comcast West Sales Program, which was overseen by Client Delivery Director Rachel Boyd. I am aware that Ms. Boyd created a "Handbook" that was only distributed to recruiters who supported Ms. Boyd's program. This document was not distributed to recruiters who supported any of the other RPO Programs since October 2013.

10. I have been asked to review the payroll and assignment data for employees who worked in RPO in the last three years. This data is made and maintained in the ordinary course of business. The company relies on its accuracy to pay employees and to properly invoice its customers.

11. During the last three years, RPO engaged 2476 employees, 1667 of whom were classified as non-exempt at some point during this period. These employees are assigned to the many different Programs for its clients. The amount of overtime worked in these Programs varies widely. For example, in a Program for a national consulting firm client, non-exempt employees tied to this Program in the payroll file received overtime pay in over 86% of the worked pay periods. Similarly, within a Program supporting a national computer manufacturer, non-exempt employees received overtime in nearly 78% of worked pay periods. And in the RPO-Comcast Northeast Program, employees reported overtime in 31% of pay periods. Overtime work is certainly not isolated to these Programs. During this period, 42% of all non-exempt RPO employees received overtime pay.

12. The number of pay periods in which RPO employees worked and were paid for overtime differs from employee to employee. However, in the last three years, 32% of these individuals reported overtime in at least 20% of the pay periods in which they worked.

13. RPO's pay policies, which apply to all RPO employees, provide that overtime compensation, at one-and-one-half times the employee's regular rate of pay, must be paid to all hourly, non-exempt employees for any time worked in excess of 40 hours per week.

14. RPO provides training to all management and supervisory employees within RPO. In this training, supervisors and managers are reminded that all hours worked, including overtime, must be paid regardless of whether an employee obtains a manager's advance authorization to work overtime. This training also reiterates that non-exempt employees must record all time worked. Finally, the training specifies that any employee complaints about inaccurate pay should be taken seriously, investigated, and that employees should not be retaliated against for raising any such concerns.

15. The company also provides employees with a Business Ethics Hotline number, where they can report any suspected violation of the company's Code of Business Conduct and Ethics, which would include any instance in which an employee believes he or she is not being properly compensated.

16. The precise job duties of Recruiters vary from Program to Program. Some Programs demand a high level of customer engagement and a very broad scope of responsibility, or require Recruiters to work with very sophisticated candidates for senior-level positions with RPO's clients. Other Recruiters have less frequent contact with customers and a narrower scope of responsibility. Recruiter compensation varies in accordance with the Recruiter's job duties. For example, as a high-volume Recruiter working from home, Karen Francis earned an annual

salary of over $50,000 a year. However, other recruiters performing different tasks earned considerably more. For example, a Senior Recruiter who supported a healthcare client placing high-level employees earned in excess of $92,000 a year.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the following is true and correct.

EXECUTED this 22 day of March of 2017.

GEOMHARA HIDALGO-BERNARD

29164818.1